NELSON v. PITTSBURG COAL DOCK CO.

MASTER AND SERVANT—DEFECTS IN APPLIANCES AND MACHINERY —INSPECTION.

In an action for personal injuries resulting in the death of plaintiff's intestate, evidence that a defective bolt in a hoisting apparatus, which broke and permitted a coal bucket to fall and cause the injuries, might have been detected by an ordinary inspection, raises an issue of fact as to the negligence of defendant.

Error to Delta; Stone, J. Submitted April 16, 1909. (Docket No. 75.) Decided October 4, 1909.

Case by Swan G. Nelson, administrator of the estate of Louis Oscar Nelson, deceased, against the Pittsburg Coal Dock Company for the negligent killing of plaintiff's intestate. A judgment for defendant on a verdict directed by the court is reviewed by plaintiff on writ of error. Reversed.

*Albin W. Norblad* (*Newton C. Spencer*, of counsel), for appellant.

*G. R. Empson* (*E. C. Eastman*, of counsel), for appellee.

MONTGOMERY, J. This action is brought to recover damages for personal injuries resulting in the death of plaintiff's intestate, which injuries were sustained while in defendant's employ on their coal docks at Gladstone, Mich. The coal dock was used for the purpose of unloading coal from boats placed at the side of the dock onto the dock. On the top of the trestle work built over the dock proper, and over the platform, were placed a number of coal-hoisting derricks. The boats were moored alongside the dock, after which the hoisting derricks would be moved on top of the dock in such a position that the booms of the derricks could be placed immediately over the hatchways of the boats. Coal buckets would then be lowered from the derricks into the hold of the boats through the hatchways, where they would be filled with coal by men stationed there. The men stationed in the hold of the boat were in the employ of the defendant, and among their number was plaintiff's intestate, who worked as a coal heaver or shoveler. In the hold of the vessel the men were provided with two buckets, so that, when one was full and being hoisted and emptied of its contents, the other was being filled.

The hoisting apparatus can best be understood by the following diagram:

TOP DECK OF DOCK.

A hoister was stationed in the place where the hoisting drum is designated as being placed. The dotted line running up from the hoisting drum and continuing over the pulley or sheave, underneath the bolt which broke, and from there continuing down around the carriage and pulley which supported the coal bucket, was the hoisting line, which raised the bucket from the hold of the boat up to the dumper or tripping apparatus. This unlatching would instantly cause the bucket to trip and empty the coal into the hopper or pocket underneath it. The carriage line was attached to the front, or, according to the diagram, the right end of the carriage, and was simply for the purpose of allowing the carriage to run out a certain distance on the boom or runway. The spot designated "bumper" above the word "carriage" was a stop at the top end of the boom. While the deceased was at work in the hold of the vessel, the eye-bolt broke, the bucket descended, and caused the injuries which resulted in his death.

The questions of fact involved on the trial were whether the breaking of this eye-bolt was due to a defect in the bolt itself, or due to improper management on the part of the hoister; it being the defendant's claim that the evidence, fairly construed, shows conclusively that the carriage must have been allowed to proceed with such force against the bumper as to place an extraordinary strain upon the bolt, and that this was the fault of a fellow-servant.

The plaintiff's claim, on the other hand, is that there was testimony which shows that the eye-bolt broke before the bumper was reached by the carriage. The plaintiff contends that there was testimony tending to show that this eye-bolt was defective, and that it had such defects as an ordinary inspection would disclose.

The circuit judge was of the opinion that there was no evidence to show a want of proper inspection on the part of the defendant's servants charged with that duty, and that from an inspection of the bolt itself it could be deter-

mined that the break was a fresh one, and that there was no defect in it which could have been discovered by inspection.

The testimony offered on the part of the plaintiff to show a want of proper inspection, and a condition of the eye-bolt which would have made an inspection of value, was that of Adam Henry, L. J. Anderson, A. D. Linn, and Carl Nyberg. Mr. Henry is engaged in a business which includes blacksmithing, although he himself is not now working at the trade, and it appeared never did except occasionally. He, however, appears to have qualified himself, to the satisfaction of the circuit judge, to speak, and he testified that, in his opinion, upon an examination of the eye-bolt, at the point where it broke, there was a defect before the breaking which could have been discovered upon an examination; that, when the iron was welded, there was a hole or a flaw, and that whoever fixed it tried to hide it by pounding; that that was the way it looked to him; that the weld was poor workmanship; that the bolt had been overheated, and that it had been broken and rewelded; that he based this opinion upon the fact that it could not have lapped over in the way it did when it was welded in the first place. He was unable to state what the tensile strength of the bolt was.

Mr. Anderson, called as an expert by the plaintiff, testified, in answer to the question as to whether the weld was so open that it would have disclosed that fact by tapping, that it was not united, and would have been noticed if it had been tapped. In answer to the question, "Could you have seen it also?" he replied:

"Well, that I couldn't say, because on account of the strain on the bolt it might have made this a little different, and I couldn't say."

When pressed: "In your opinion, could it have been seen?" he replied:

"You might have noticed some defects, to some extent.

"*Q.* Would there have been any opening in the bolt at the place where it broke?

"*A.* Well, it looks that way. Of course, you can't tell exactly, now. I wouldn't say that you would certainly tell. You could certainly tell if you tapped it."

Mr. Linn testified in answer to the question:

" Can you tell by the inspection of a piece of iron that had been broken whether there was a visible defect in it before the break?

"*A.* At times you can; yes.   *   *   *

"*Q.* What is your judgment as to whether there was a visible defect?

"*A.* Yes; I think there was. I am positive there was, because it is partly burned in making.   *   *   *   The iron was spoiled by the man who made it.

"*Q.* Could it be ascertained by an examination?

"*A.* Yes; it shows, shows it right here. It wasn't welded hardly half.

"*Q.* What test would you apply to ascertain whether there had been a proper weld or not?

"*A.* That I couldn't state; but, if I was making it, I could see when the iron is welded. It shows all the defects that are in it after it is cooled off. If hammered together, it is hard for a man to see if it is solid or not. If it is hammered together and then smoothed off, like, then it is hard to say.   *   *   *

"*Q.* Do you know of any known way or method of testing such a piece of iron after it is welded, to ascertain whether it is sound or not after it is finished?

"*A.* The only way would be to hammer on it.

"*Q.* Would that disclose whether it was?

"*A.* It would; yes.

"*Q.* Is that a usual and customary method?

"*A.* No; it is not by the general blacksmith, because a man who is a workman he generally makes a good job of it, if he can.

"*Q.* Suppose an eye-bolt was brought to you for examination. What would be your method of testing it?

"*A.* If it was brought to me to find out, I would bend it, and bend it when it was cold, which would show you.

"*Q.* Was there such a defect in that piece of iron before as would show plain and open, obvious, visible?

"*A.* Yes."

Carl Nyberg, a blacksmith, who had worked in different machine shops and general blacksmith shops and had

made eye-bolts and welded·iron, testified that from an examination of the bolt he could see a hole in the eye-bolt, and was sure he could have seen it before it broke.

The testimony offered on behalf of the defendant tended to show that the eye-bolt in question was manufactured by a reputable firm of whom the apparatus was bought, and that it was inspected by the employés of the defendant within a few weeks before the accident, and that it was then placed·in the timber, and that daily such inspection as could be made without taking it out of the timber was given it.  There was testimony, also, on the part of the defendant, tending to show that an inspection of such a bolt by the hammer test was not adopted by those who use them ordinarily.

While the testimony showing that this bolt, when last put in place, had a defect which could have been discovered by a visual inspection was meager, we are constrained to hold that there was enough to carry the case to the jury, and that an examination of the eye-bolt does not conclusively establish that plaintiff's witnesses are mistaken.

The judgment is reversed, and a new trial ordered.

BLAIR, C. J., and GRANT, MCALVAY, and BROOKE, JJ., concurred.